I'd like to start out by either letting the court know or continuing to refuse the court, that the standard of review in this case is to know whether or not Congress' and former Congress' determinations are lawful or unlawful, if they're supported by the state's ordinance on the record, or otherwise, in accordance with the law. I plan to talk about three issues today, but I want to start first and foremost with the WTO's decision and agreement by the U.S. government to resolve the zeroing issue in this case in a nine-month period. The court did not grant this step, but we laid out specifically in that motion why, in fact, the application of zeroing in this case would root all the other issues, because the former Congress is applying zeroing in this case. Contrary to the Dunboo decision, which was issued about a month before our brief, and JTAG, which was issued subsequent to our initial brief, but prior to our response brief, if in fact a final determination by the review of the zeroing issue is resolved in favor of requiring a consistent interpretation of the statute of what constitutes a double margin for the four investigations and reviews, there would be not only zero margins in this case, but a hugely negative margin in this case. Because we didn't have the opportunity to know that Dunboo was going to come down when they first filed an appeal, or for that matter, a serious appeal in support of international trade, etc. And at the time, as was pointed out by this court in Dunboo, there had been seven different decisions in the last decade which affirmed the Department of Commerce's use of zeroing. It would have been inappropriate at the time for us to raise that to the courts. In fact, we would have been risking a rule-abiding sanction. We did raise zeroing in the administrative review, in the original review, because this was subsequent, the Department's determination was subsequent to the change in practice by the Department of Commerce with respect to investigations. So, we would ask the court to remand this case in accordance with Dunboo and JTAG. This is the first time I remember a brief allusion in what you raised with your own initiatives, the first time you made a request for this relief. No, in fact, we requested this relief in our conclusion, in our response brief, Your Honor. In your reply brief? In our reply brief. We can't raise things for the first time. Well, we appreciate that. We are caught in an issue. We did put Dunboo inside it in our original brief, and we did ask for relief in the response brief. And if the court doesn't accept that, in the case of JTAG, for the first time, the relief was asked at oral argument. So, and the court did reverse it. The courts remanded Dunboo. Dunboo is clear enough on what the law is. What are the facts relevant to the law? Did they use zero rating for one, and not for the other? Yeah, they applied zero rating. This is the first administrative review in this Dunboo case. And the Department of Commerce uses normal practice of applying zero rating. And this review, the final determination, was subsequent to their change in practice I don't, maybe I'm missing something, but I didn't think when you said zero rating was bad. I thought what you said was you can't change your practice in the middle of the same series. Well, my understanding was that the change of practice was with regard to investigation and not with regard to reliefs. And that the interpretation of the statute, which had the exact same language for both, could not be inconsistent. Now, in fact, they used zeroing in the original investigation in this case. They did. Because it was prior to, yes, because it was prior to that change in practice. And did they use zeroing in the follow-up investigation? Well, in the first annual review, which is this case we have in court, yes, they used zeroing again. And your argument is that, um. That once they changed the practice, that zeroing could not be, that as I understand it, that the department did not have the different interpretation of the same wording in the statute for investigation and review. I'm not understanding. You're saying there were two different ways. But it's not my understanding, and I apologize to the court, it's not my understanding. It's not my understanding that the difference relates to the exact investigation and review series of activities. That's the way the first administrative review, I believe the case in some groups, was the 12th or 14th administrative review. Your understanding is that they go back to their so-called normal practice. They can't use zeroing at all. That's correct. Once they change the practice, under the statute, they can't use zeroing at all. That's correct. Um, let me move on then to the issue of new information. There was a series of, at preliminary determination, in this case, there were a series of questions that came up that we first saw that were mistakes. One in particular related to the home market BRICS levels of the arms use, non-concentrated arms use, being compared with the U.S. sales price. As you may have not agreed, BRICS level is simply a variable used by the Department of Commerce to convert a volume-based price to a pound-solid-based price, a weight price. It has no effect on price other than making the conversion correct. The, Fisher submitted incorrect information in his original questionnaire related to the BRICS levels of the home market sales. There were four home market sales. Three of them had what were really minimum allowable to the customer, 10.5. How do we know that's the minimum allowable? I'll tell you what's bothering me about this issue, is that I'm having a very hard time, I'm sympathetic with the overall legal proposition that you should be entitled to make a demonstration, even if, believe it or not, that there's a clear capital issue, however, here in the case of your presentation to Commerce as to exactly what was going on, because it was, I heard it with some care through the briefs, through the briefs submitted to Commerce and through the backup information, and I'm having a hard time either seeing that you were consistent in what you were saying was wrong or that you identified that what was done initially was a minimum as opposed to the standard use, or the actual use, and where the standard use came in as a recommended recourse. So, can you straighten that out for me, starting with where I can find a clear indication that the 10.5 is a minimum? My pleasure. I fully understand. Do you understand? I understand fully, because I've lived this, so I understand fully. So, to answer the initial question, the exhibit 3 in the rejected brief clearly shows the specification sheet, which shows that the 10.5 is a minimum. Okay, now let's get realistic here. In that exhibit, in this, because you cited us to pages, well, the pages that are after the invisibility, can you point me to the particular page? JA 106. 106. Okay, all right. Now, that was, where did this document come from? This document comes from the company. Okay, and this was submitted by the company with, was that with this brief? This was submitted by the company with a brief. After the preliminary determination. Right, with that brief. All right. It was exhibit 3. All right. And you can see in the first line, Fritz corrected USDA minimum 10.5. Well, then, why do you say at the bottom of 84, the department's use of actual bricks, in lieu of the regulatory standard bricks, resulted in distortion? You're saying that now that you are telling the agency in your brief that it's actual, and you're telling them in your exhibit that it's minimum. There was a whole huge discussion over the U.S. sales contracts, which required a standard bricks. 11.8 was the standard bricks under the contracts that the U.S. sales were sold upon. Right. The fundamental argument that we were making at the time, and throughout, was that the standard bricks under that contract, that's what the comparison is. The argument has always been, and I would agree this record is a bit confusing, the argument has always been that you don't need to use bricks, you don't need to make this conversion. But we accept the fact that the Department of Commerce has the discretion to make the conversion, because they're used to doing it for not from concentrates, which is always on a weight basis. And understanding that certain deductions are easier to do with respect to the weight basis. So we're okay with that. But if you make it, the bricks levels in the home market, when you make your conversion to the new home market pound solids, and you make your conversion on the U.S. side, from the not from concentrate to the pound solids, the price effect has to be neutral. And in fact, in the questionnaire, in the A questionnaire, when we first responded to the Department of Commerce, we specifically said that 11.8 was the bricks conversion basis. So... For both. Well, for both. The struggle was that there is no standard on the home market side as to what standard bricks number is. I mean, there's the USDA... The USDA has a clear standard. In the U.S., you've got to get up to 11.8. The standard bricks is recognized in the U.S. as 11.8 for not from concentrate, and it was specifically in the contract for that basis. When... As a minimum, presumably. I'm sorry? As a minimum, presumably. If you're at... Oh, yeah, yeah. Well, in fact, it doesn't have to be a minimum. There could be pricing adjustments that take place if you're lower... I understand. So, when the Department of Commerce came out with preliminary determination, when we saw the margin, we said, what's going on here? They said, we used actual bricks. We used actual bricks to do this comparison. And at that point, we saw what the information supplied to the Department of Commerce was of very low bricks in the home market. 10.5. 10.5. Right. The effect of that is when you convert the volume... I know it's a bad effect. It's a bad... I didn't like it. We didn't like it. You're saying you used the minimum bricks at home and you used standard, i.e. actual for all practical purposes in the U.S. sales, and therefore that creates a problem. You say the department used actual bricks as opposed to standard, right? They used actual bricks for their commercial. And we supplied them at exhibit three, which was rejected. Not only the specification sheets, but the actual bricks for each of those sales based on the packing slip at the time. In other words, in that exhibit three that was rejected, we said, hey, we were pointing that the 10.5 is the minimum we gave them the sheet, and we provided the information of the actual bricks for each sale, which were significantly different than the 10.5 and would have a significantly different outcome when converted from the volume base to the pound solid. But you asked them to use the standard bricks. We were arguing for the standard bricks in the rejected brief, and later on we didn't have the information on the record because it had been rejected. The Department of Commerce said, look, you need to eliminate this information, this information, this information, and we submitted it. The fact that they required you to draw out all that, if you had made a showing that was clear that you were entitled to the brief you were asking for, the fact that they drew the record out of those materials, that wouldn't hurt. You could still be making a second year out of it now. Yes, I think absolutely. But under NTN-bearing and TIN-bearing, the fact that they had the information that was a pure variable that was strictly for doing a calculation is the critical point. Whether we pointed out in our briefs whatever our theories were on the briefs, once we gave them the corrective information, it was not new information, it was not untimely information, and should have been used. And there was no burden here because, in fact, you had three sales. That was it. But the burden is about $3 million in dumping duties because of that calculation. You want to say anything very briefly about the inventories issue? No, I want to focus really on the regulation itself. There was a sale that was prior to the suspension of liquidation in this case. A whole market sale that was used to compare under the Department of 1960 data rules to come to a comparison price. We have taken very firmly with you that the regulation is not valid. That the review regulation has very different language when you're looking at the period of review, the first annual administrative review in all Congress. And the language is clear on its face. It's 351-213-E1 for all other reviews. It says, review under this section normally will cover, permissible, normally will cover as appropriate entries, exports, or sales of the subject merchandise during 12 months of subject merchandise. E1-2, an administrative review, which is the first annual review, under this section will cover. It doesn't say normally will cover. It says will cover. As appropriate, entries, exports, or sales during the period from the date of suspension of liquidation. Does not say subject merchandise. Does not say U.S. merchandise. The regulation says that in many other places, but in this particular regulation, which applies only to the first administrative review, which is this review, those words do not appear. It is very narrow. Will cover. Does not say subject merchandise. Thank you very much. I would say you can vote on this bill. Mr. Gurley? May it please the Court. Before I turn to my remarks on the issues that were actually briefed in this case, I petition to be raising the issue the first time before this Court that was not briefed, that indeed was not even part of the claims of the raising of the complaint in this matter. And what my intention to do is to actually address the issues that were briefed in this matter, and then come back at the end to zero in and address that issue. Do you realize that the Court can ask questions which might take counsel into a new direction? Yes. I understood, Your Honor, and I'm prepared to answer any questions that Your Honor has asked. Let's go in a new direction. Okay. How do we not remand on the zeroing? Do you concede that zeroing was used in this case? Zeroing was used in this case in both the investigation and the investigation. Is it my understanding that zeroing is no longer the policy that Congress is following? That's not correct. Congress, some time ago, determined not to continue using zeroing in certain types of investigations, but continued to use it in administrative cases. Who's at fault in that? Well, the Court has remanded for further explanation in Donovan v. Jaycock. But the issue here, Donovan v. Jaycock said you've got to explain it, and in the second case, they said we explained it, and we said no, you didn't. Is there any real doubt in your mind that they got it one way or the other, and if so, doesn't this case say, wait a minute, we've got to find out what the answer is? Well, first, Your Honor, the second case, Jaycock, and Jaycock did not say the explanation is unreasonable. That's another instance in which the party hadn't brought a specific argument before Commerce. We argued that Commerce had made its reasoning more detailed about zeroing in the review, and the Court said that reasoning isn't good enough. We're remanding it back for you to provide further explanation consistent with Donovan v. Jaycock. So even in Jaycock, the Court still hasn't ruled on one way or another. In both cases, it's been remanded to the Court of International Trade, and the Court of International Trade of Commerce has finally remanded the results with the further explanation the Court had sought in both of those cases. But to step back for a moment, again, zeroing, as the Court correctly noted, was not and has never been an issue in this appeal. It is well established that a party cannot raise a new argument on reply or in equipment. In this case, even if the law changes while the briefing is going on, the law has not changed while the briefing is going on. The Donovan v. Jaycock decision was issued before the briefs in this case. Well, first of all, just to be clear... Whatever you believe you want to direct our attention to, please do. Okay. Okay. Let me first focus on the issue of the briefs level. This is not a case about whether commerce is authorized to correct mistakes. This is a case about whether commerce acted reasonably based on records and the arguments that were before it in this case. If there is any doubt in this case about whether Fisher was making an attempt to bring a mistake or error to commerce's attention with respect to the briefs level that was reported, that doubt is resolved by the fact that Fisher was not even citing the documents that it now claims were corrective information concerning the briefs level in support of the briefs level argument. So, in particular, Petitioner's counsel was incorrect when he stated during his remarks that Vivid 3 included this corrective information. Actually... Right. We don't have a whole set of data to go along with this brief, so we're at your mercy. Does that tell us whether this 106 is part of the Exhibit 3 or not? That's something I can clarify for you. Fair enough. So, first of all, if you look at J.A. 85 and 86, which is where Fisher made the argument, Fisher is only citing Exhibits 1, 2, and 3. All right. And that takes us through J.A. 106 and the record. Which... J.A. 106 is Exhibit 3. Right. Right. And so, there's nothing erroneous about that. Fisher reported a number of brief levels. Right. So, what he said that was wrong was that everything after that in the record, which actually included the information that Fisher said that offered to, quote-unquote, correct the brief level, is not Exhibit 3. That is Exhibit 4 to Fisher's case brief. And that contains these packing slips that supposedly offered what he, what Fisher now says is the correct brief level. And those documents were offered in support of an entirely different argument that Fisher was making. Exhibit 4 is cited later on in the case brief. And it's about some of the issues here. The 1960 day rule, the inventory accounting clause. But those documents... That's right. That's right. But now... Well, no. Fisher also was claiming that... The actual BRIC levels are measured by the USDA in the United States. And Fisher was arguing that in both cases one should use standard BRIC levels. Standard BRIC levels for the U.S.? They argued standard BRIC levels for the U.S. as opposed to actual. And standard BRIC levels for the home market as opposed to actual. But the standard BRIC level for Brazil is 5.5. That's right. That's right. We're saying you shouldn't use any actual. You should use standard in the U.S. and standard here. And that's an apples-to-apples, at least. Right. Right. In commerce, actually, what is not an issue here is that commerce uses actual as opposed. And that was affirmed by the trial court in appeals. Commerce uses actual for the U.S. but minimum for Brazil, right? Well, commerce seeks to use actual for Brazil as well. Oh, that's how they use it in this case, right? Well, Fisher reported its BRIC levels as actual BRICs. What Fisher was saying... 10.5? To the extent Fisher reported some of the sales as 10.5, Fisher was saying these are actual BRICs for those sales. The only place I could find that, any other reference to 10.5 besides J106, was in that very long list. Let's see if I can find it now. I've lost my pad. Well, go ahead. It's... I will find it. Well, the point is that Fisher was claiming that... Fisher is now claiming, no, we were saying that our minimum... On page 75 and 76, items 366, 432, and 460 all have BRICs H10.5. Right. But there's nothing to indicate, at least when I'm doing it out of my mind, that that's minimum versus our actual. That's exactly right. And the documents that Fisher was now saying show that there was a different BRIC level that were actual. Or even before, they're packing slips. Fisher is saying, we offered these documents to show that the BRIC level was wrong, but it didn't offer those documents to show that the BRIC level was wrong. It made an argument, a methodological argument, about standard BRICs versus actual BRICs. And those documents happen to be in the record. What's problematic here is the notion that a party can kind of simply dump a bunch of documents in the record and then claim ex post, the first time in litigation, that actually what we were doing was trying to correct a mistake. And neither the NPM decision nor the Timpkin decision stands for that. So you're saying that Commerce ultimately concluded that H10.5 was the actual BRICs for each of the transactions in the home market? Well, that's actually not quite correct. Commerce concluded that... Commerce relied on that. I keep getting hung up on that point as you go through this. Where did Fisher say that H10.5 was the actual BRICs? In his questionnaire, Commerce asked, report the BRICs of the sale. And so in providing the documents, these are the documents that page 75, 76 of the record. A similar document page 148 to 152 of the record. These are the sales that Fisher reported as the actual BRICs. Okay. I was just looking at 75 and 76. It wasn't responsive to a question as to what is the actual BRICs. What are the BRICs? The better document to look at is 148 to 152, because what that document shows is what the court noted in its opinion, which is that Fisher was coming into the trial court and saying all of the BRICs we reported were at a minimum level. Fisher, again, was not citing any of the documents he cites now, saying that actually we gave you other documents showing the BRICs were at a different level. But that each of the items we reported were at a minimum level. And the trial court looked at a document page 148 and noted that actually the BRIC levels that Fisher reported varied. Now, can we point your honors to lines 400 and 460 of that document? And so the court ruled that it was perfectly reasonable for Commerce, given the record in front of it, given that Fisher wasn't making any arguments about we made a mistake, and the fact that the BRIC level that it was looking at, and these are excerpts of the overall database, varied, that it was perfectly reasonable for Commerce to determine that it was looking at the actual BRICs. Well, Mr. Carlin, that may be true, that it was perfectly reasonable for them to do it, but is it or is it not the case that the BRICs level reported, at least to some extent, were erroneously reported? Is that true or is it not true? We don't know the answer to that. And for several reasons. First of all, as the court noted, the BRICs vary. Second of all, if you look at the results of the remand that the trial court took in this case, so the second Fisher decision, the court did remand one of the issues, in which it did determine that Fisher had fairly made an argument about that we reported something erroneously. And on remand, determined that the information that Fisher claimed showed that there was an error was not, Commerce determined, and the court affirmed, that it didn't reliably show that there was an error. So, again, you have an instance where Fisher is not claiming it made a mistake. It's not pointing to the document. It's now claiming, shows it made a mistake. And Commerce was simply not given an opportunity to address that issue. But it's certainly not, we certainly do not agree that there was certainly a mistake made here. At this point in life, is there evidence that there was a mistake made? No, there isn't evidence that there was a mistake made. Fisher has submitted a couple of packing slips that it claims show that there was an error. But no, we don't know whether there was a mistake made. And that's what the court noted in Timpkin and NPN, that it's permissible for a party to come in at the preliminary stage and say, look, we made an error. Please fix it. But once you get past the preliminary stage, which we did here, to the final stage, concerns about finality begin. It's simply not appropriate for a party in litigation and then on appeal to first claim that we made an error. NPN and Timpkin, they're all called Timpkin. But I thought NPN and Timpkin were posts that were untimely requests for new information. Was it untimely but still before the preliminary results or after the preliminary results? It was untimely but still before the final results. Yeah, but that's true here too. But that's not true here in that point. This reading was filed after the preliminary before the final, right? That's true. But here, in Timpkin and NPN, the parties actually made an argument about error in their cases. Yeah, but that goes to the merits of whether or not they adequately called your Congress's attention to the problem, not in what I thought you were saying, which is this case involved a different stage in the process from Timpkin and NPN. Well, this is the same stage in the process, correct? It's not the same stage in the process. What is the difference between this case and Timpkin and NPN with respect to the stage in the process? Because Fisher only raised an issue of mistake and, indeed, only cited documents that it's now claiming show the mistake in litigation before the Court of International Affairs. But if you look at the question, if you assume, for purposes of our argument, that what Fisher thought was a perfectly adequate document calling your attention to the mistake, then this case would be timeliness-wise on all fours of the other two, correct? Yes, and Congress would have considered that allegation on this case. Right, but I thought you were saying that it was different. Okay, so there is no bar to their bringing in the evidence. There is a bar to bringing in the evidence in the sense that Fisher did not offer the evidence as – we have to deal with the fact in front of us. Fisher did not offer the evidence in connection with an allegation of mistake. Your argument, is it not, is just not that there's a problem with the timing so much as they just didn't make an adequate showing that there was an error, period, in the case. Isn't that your argument? They didn't make an adequate showing, but they didn't even make an argument that there was an error. And so – All right. Now, do you still want to agree with Joe Grasson's argument or not? I do, Your Honor. Let me make two very, very short points. Well, you're running out of time, so make them very short, all right. Okay. With respect to the inventory countering cost issue, the standard review is actually abuse of discretion. That's in the F. Lilley DiCecco case that Fisher cited in his brief. Here, the felder did not abuse of discretion and thoroughly examined the record and determined that Fisher had not raised this inventory countering cost. Second of all, I'll leave it to Mr. McGrath to speak to this. We have checked and double-checked. The issue is simply moved. Commerce did not use the inventory countering cost. That's your point, that it won't have any impact on the outcome. That's what we said, right? This figure was not used in Commerce's calculations at all. No, it didn't say that. Thank you, Mr. Krugman. Okay. Mr. McGrath, do you have a few minutes? Thank you very much. May it please the Court, I'm Matt McGrath of Farns Richardson, representing petitioners in this case, Florida Citrus Mutual. I will be very brief. I concur in everything the government has said about these issues. I wanted to add one observation to maybe add to the discussion here of NTN and the ability to make corrections. I represented NTN in that case. It's hard to imagine 17 years ago. And the big difference between this one and that one is that the errors were in transcription. In the submissions themselves that went to the agency, they were discovered right after the preliminary determination. And brought to the attention of the Commerce Department immediately. And we went to the Commerce Department and pointed out, these are the errors. These are what the correct data should be. It was simply transcribed error. An incorrect digit went into a classification of a merchandise, and that result in the margins didn't need to be there. It's very clear to me that if this case involved a simple, straightforward statement immediately after the preliminary results, it would say, well, you used actual bricks in connection with the U.S. sales, and you used minimal bricks with respect to home sales. And here's the proof of it. And the proof were absolutely plain and clear. But that would be something the Commerce Department had not only the opportunity, but the obligation to consider. They would consider it, I'm sure, if they were to present the information. And if they didn't, we would reverse them, correct? Pardon? And if they didn't, we would reverse them under the authority of NTN. I guess where I'm going with this is to try to see if there's any significance to your statement that, well, NTN was a case that involved just a calculation error or a transcription error. Right. Now, this would be similar to the same kind of error, correct, in terms of its cognizability under NTN and PNP, even at the post-preliminary stage, correct? Yes, it would, Your Honor. All right. It could be considered in that fashion. My point was simply that there is a significant difference between – both cases happened right after the preliminary determination, but there's a very significant difference in how the alleged errors were presented. In this case, they were never presented until it reached litigation long after the final determination. It's very difficult to imagine a scenario where these issues can remain open indefinitely without specific identification of errors that can be corrected by the agency. It was not identified. The other issue I just didn't want to also mention that Mr. Kermlin mentioned, is the inventory carrying cost issue. It's not quite clear why, but we've spent time discussing it here. We've looked at it, and you can refer to the appendix, pages 164 to 168, specific lines in those appendices – I'm sorry, 163 to 168. Specific lines there indicate that there was no consideration of inventory carrying costs in calculating the margins in this case. This discussion of how it's calculated is moving. Thank you. Thank you very much. Mr. Taylor, if you'd like to make a comment. Thank you. Just two quick points. The first of them is the precision of how it was raised. The argument at the time was about the use of standard bricks. It very clearly stated to the Department of Commerce that what we submitted was minimum bricks, and that was the purpose of putting that exhibit in place. Commerce was unnoticed that that whole market bricks was incorrect. If they had accepted the exhibits, and I apologize for Exhibit 3 and Exhibit 4, but if they had accepted the exhibits on the record, the correct information would be there. I just want to close with pointing out another zeroing issue, which was done in our briefs as well, Arnell v. Haldeman in a Supreme Court case, which very specifically says, there may always be exceptional cases or particular circumstances which would prompt a reviewing or appellate court where injustice might otherwise result to consider questions of law that were neither pressed nor passed upon by the court or the administrative agency. I just want to make that point out, which is how great does control of institutions like ours, appropriate for us to raise in this case.  Thank you. Thank you, Mr. Chairman. Congratulations.     Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. The Honorable Court is adjourned tomorrow morning at 10 o'clock a.m.